## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                      No. CR 23-1834 JB

MIGUEL ANTONIO RAMIREZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Sealed Objections to the Presentencing Report, filed May 12, 2025 (Doc. 82)("Objections"). Sentencing is scheduled for June 12, 2025. See Order Granting Unopposed Motion to Continue Sentencing at 1, filed May 15, 2025 (Doc. 86). The primary issues are: (i) whether the Court should decrease Miguel Antonio Ramirez' United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") offense level by 2 levels, because Plaintiff United States of America cannot prove, by a preponderance of the evidence, that Ramirez is accountable for selling 9,319.40 grams of fentanyl, which includes: (a) 31,160 pills, with a net weight of 3,217.00 grams of fentanyl, seized during Ramirez' arrest; and (b) $61,0240.00 in cash found in co-Defendant Isaiah Anthony Aragon's apartment later that day, converted to 6,102.40 grams of fentanyl at $10.00 per gram; and (ii) whether the Court should decrease Ramirez' Guidelines offense level by an additional 2 levels under U.S.S.G. § 2D1.1(c)(18), which provides for a 2-level reduction for some non-violent defendants who cooperate fully with the United States. After carefully considering the parties' arguments, the relevant materials in the record, and the applicable law, the Court sustains in part and overrules in part Ramirez' Objections, because: (i) the United States does not prove -- by a preponderance of the evidence, see United States v. Magallanez, 408 F.3d 672, 685 (10th Cir. 2005)(McConnell,

J.) -- that Ramirez is responsible for the cash proceeds found in Aragon's apartment; and (ii) Ramirez' cooperation is not fulsome enough to warrant a 2-level reduction under § 2D1.1(c)(18). The applicable offense level is 29, the applicable criminal history category is I, and the Guidelines imprisonment range is 87 to 108 months.

## FACTUAL BACKGROUND

The Court relies on the Presentence Investigation Report, March 3, 2025 (Doc. 68)("PSR"), for factual background. Ramirez does not object to the PSR's facts other than: (i) the PSR's alleged[1] identification of Aragon's apartment as a joint stash house; and (ii) the PSR's references[2] to several drug transactions between Ramirez and an undercover agent, outside of the transaction underlying Ramirez' conviction. See Objections at 3-4, 10-12. The Court thus concludes that those undisputed facts are the Court's findings of fact. See Fed. R. Crim. P. 32(i)(3)(A) ("[The court] may accept any undisputed portion of the presentence report as a finding of fact.").

---

[1]The PSR does not say that Aragon's residence is a stash house. Instead, the PSR says that the residence "was believed to be a stash house," PSR ¶ 10, at 5, or that "the case agent identified Aragon's residence as a 'stash house' for both Aragon and Ramirez," PSR ¶ 17, at 6 (internal quotations have no citation). Ramirez does not dispute that authorities believe that Aragon's residence is a stash house. See Objections at 3-4. Rather, Ramirez argues that Aragon's residence is not, in fact, a joint stash house, and that Ramirez is not responsible for the cash and other incriminating items in the residence. See Objections at 3-4. Accordingly, the Court concludes that the PSR's statements about agents' beliefs regarding Aragon's residence are not disputed.

[2]Ramirez does not deny that those transactions take place or dispute the PSR's facts describing those transactions. See Objections at 10-12. Instead, Ramirez argues, in the Objections, that the Court should not consider those transactions, because the United States does not provide Ramirez with requested discovery regarding those transactions. See Objections at 10-12. In a supplemental filing, Ramirez walks back this argument and withdraws this objection, because the United States clarifies that the PSR's references to other drug transactions are based only on disclosed materials. See Sealed Notice Regarding Objection II to Presentence Report at 1, filed June 11, 2025 (Doc. 98)("Objection Withdrawal"). Accordingly, the Court concludes that the PSR's facts regarding those other transactions -- which include a summary of Ramirez' post-arrest interview where Ramirez describes his involvement in Aragon's drug trafficking activities -- are not disputed.

When resolving factual objections, the Court must determine whether the United States has met its burden of proving disputed facts by a preponderance of the evidence.  See <u>United States v. Olsen</u>, 519 F.3d 1096, 1105 (10th Cir. 2008).  In evaluating whether the United States has met its burden, "sentencing courts may consider hearsay evidence provided that the evidence has sufficient indicia of reliability."  <u>United States v. Dazey</u>, 403 F.3d 1147, 1177 n.7 (10th Cir. 2005). <u>See</u> U.S.S.G. § 6A1.3.  "This is not a high standard, for it requires only 'minimal indicia of reliability.'"  <u>United States v. Ayon</u>, 226 F. App'x 834, 840 (10th Cir. 2007)(unpublished)(quoting <u>United States v. Fennell</u>, 65 F.3d 812, 813 (10th Cir. 1995)).[3]  At sentencing, courts also may consider and rely upon out-of-court statements if those statements are admissible under the federal rules and <u>Crawford v. Washington</u>, 541 U.S. 36 (2004)("<u>Crawford</u>"), without evaluating separately those statements' reliability.  <u>See</u> <u>United States v. Garcia</u>, No. CR 24-0092 JB, 2025 WL 1518816, at *1 n.2 (Browning, J.)(D.N.M. May 28, 2025).

On December 6, 2023, an undercover officer with the Albuquerque Police Department arranges to purchase 30,000 fentanyl pills from Miguel Antonio Ramirez.  <u>See</u> PSR ¶ 10, at 5.

---

[3]<u>United States v. Ayon</u>, 226 F. App'x 834 (10th Cir. 2007), is an unpublished opinion, but the Court can rely on an unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent . . . .  And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that <u>United States v. Ayon</u>, <u>United States v. Murphy</u>, 769 F. App'x 631 (10th Cir. 2019), <u>United States v. Hendrickson</u>, 592 F. App'x 699 (10th Cir. 2014), <u>United States v. Davis</u>, 802 F. App'x 318 (10th Cir. 2020), <u>United States v. Schmidt</u>, 353 F. App'x 132 (10th Cir. 2009), and <u>United States v. Callejas</u>, 66 F. App'x 826 (10th Cir. 2003), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

After the undercover officer contacts Ramirez, federal agents follow Ramirez as he drives to Aragon's residence. See PSR ¶ 10, at 5. Ramirez parks in front of Aragon's residence, which agents "believed to be a stash house where Ramirez and Aragon stored illegal narcotics." PSR ¶ 10, at 5. Ramirez contacts Aragon, and Aragon agrees to supply Ramirez with 30,000 fentanyl pills. See PSR ¶ 10, at 5. Aragon exits his residence with a tan plastic bag, walks over to Ramirez' vehicle, and sits in the front passenger seat. See PSR ¶ 11, at 5. Agents approach the vehicle and attempt to take Aragon and Ramirez into custody. See PSR  ¶ 12, at 5. Agents arrest Ramirez without incident. See PSR ¶ 12, at 5. Aragon leaves the tan plastic bag in the front seat and initially flees but is taken into custody through use of a canine. See PSR ¶ 12, at 5. Agents collect the tan plastic bag, which contains 31,160 fentanyl pills with a net weight of 3,217.00 grams. See PSR ¶ 12, at 5. Inside Aragon's residence, agents locate Chanel Padilla, Aragon's romantic partner, and a minor child. See PSR ¶ 13, at 5. Later that day, agents search Aragon's residence and locate: (i) $44,500.00 cash in the living room; (ii) $16,200.00 cash in a jacket pocket in the bedroom; (iii) $324.00 in Aragon's wallet; (iv) a digital scale; and (v) an electronic money counter. See PSR ¶ 13, at 5. The seized cash "was identified by the assigned agent as drug proceeds." PSR ¶ 13, at 5.

On the same day, agents interview Ramirez, who says that Aragon sells him the fentanyl pills on credit. See PSR ¶ 14, at 6. Specifically, Ramirez says that he intends to pay Aragon $13,000.00 for the pills and resell them for $30,000.00. See PSR ¶ 14, at 6. Ramirez also says that he buys "boats"[4] several times weekly from Aragon for approximately $350.00 per boat, which he then resells for $1,000.00 each. PSR ¶ 14, at 6. Ramirez also says that he has been drug trafficking for approximately two years. See PSR ¶ 14, at 6.

---

[4]"A 'boat' is a common street terminology for a quantity of 1,000 fentanyl pills." PSR ¶ 14, at 6.

## PROCEDURAL BACKGROUND

The Court describes this case's procedural background in four sections. First, the Court describes the PSR. Second, the Court discusses Ramirez' Objections. Third, the Court summarizes its Memorandum Opinion and Order, filed May 14, 2025 (Doc. 84)("Aragon Objections MOO"), where the Court overrules Aragon's objections regarding the cash-to-drugs conversion in Aragon' PSR. Fourth, the Court describes the Addendum to the Presentence Report, filed May 15, 2025 (Doc. 85)("PSR Addendum"). Fifth, the Court describes the United States' Sealed Response to Defendant's Sealed Objections to the Presentence Report, filed May 27, 2025 (Doc. 94)("Objections Response").

### 1.    The PSR.

On February March 5, 2025, the United States Probation Office ("USPO") files the PSR. See PSR at 1. The PSR asserts that Ramirez is accountable for 9,3129.40 grams of fentanyl, which includes both the seized pills and the seized cash, converted to fentanyl at $10.00 per gram:

> Case agents advise they know of additional occasions that Aragon supplied **Ramirez** with narcotics; therefore, **Ramirez** is also responsible for the cash proceeds located in Aragon's residence due to his participation in furtherance of the jointly undertaken criminal activity and the proceeds being a reasonably foreseeable result of this activity.

PSR ¶ 17 at 6 (bold in original). The PSR applies, pursuant to U.S.S.G. § 2D1.1(a)(5), a base offense level of 34. See PSR ¶ 23, at 7. U.S.S.G. § 2D1.1(a)(5) assigns a base offense level of 34 to drug-trafficking defendants accountable for between four and twelve kilograms of fentanyl. See U.S.S.G. §§ 2D1.1(a)(5) & (c). The PSR does not apply an enhancement for maintaining a premises for drug distribution:

> Though the case agent identified Aragon's residence as a "stash house" for both Aragon and **Ramirez**, no additional drugs were located in the residence and the case agent advised this was the only occasion in which Aragon was seen leaving the residence with suspected narcotics, therefore, an enhancement pursuant to USSG § 2D1.1(b)(12), concerning maintaining a premises, will not be applied.

PSR ¶ 17 at 6 (bold in original).  The PSR asserts that, "as of the disclosure of this report, the defendant has not successfully debriefed with the government."  PSR ¶ 17, at 6.

      2.      **Ramirez' Objections**.

On May 12, 2025, Ramirez files his Objections.  See Objections at 1.  Ramirez makes four objections.  See Objections at 1-16.  First, Ramirez argues that the PSR incorrectly states that he is responsible for the full 9,3129.40 grams of fentanyl, which includes both the seized pills and the seized cash, converted to fentanyl at $10.00 per gram, because the United States does not show -- by a preponderance of the evidence -- that Aragon's residence is a joint stash house or that Ramirez is sufficiently connected to the cash in Aragon's residence.  See Objections at 1-8.  Pointing to several recordings provided during discovery, Ramirez asserts that: (i) Ramirez neither lives at Aragon's residence nor owns any of the vehicles parked there; (ii) investigating agents "had never seen Mr. Ramirez at the residence before"; and (iii) Ramirez does not go inside the residence during the December 6, 2023, sting.  Objections at 2.  Ramirez also says that authorities' "belief" that the residence is a stash house does not meet the preponderance standard, particularly when agents do not find any additional narcotics, tools of the drug trade -- other than a money counter and large cash amounts -- or other items belonging to Ramirez inside the residence.  See Objections at 3-4.  Accordingly, Ramirez argues that the cash inside Aragon's residence "is not relevant conduct of Mr. Ramirez under U.S.S.G. § 1B1.3."  Objections at 5.

Second, Ramirez argues that, even if the cash is attributable to Ramirez, the PSR uses an "unreliable conversion rate . . . to unreasonably inflate the drug quantity calculation."  Objections at 9.  Ramirez argues that the United States' proposed conversion rate of $10.00 per gram -- which is based on the controlled purchase price -- "does not reflect the United States Government's public declarations of the value of fentanyl."  Objections at 9.  Citing reports and press releases that the Interior Department and the Drug Enforcement Agency published, Ramirez argues that the

conversion rate should be between $142.50 and $200.00 per gram, which "would place the total drug quantity at 3,552 grams to 3,645 grams rather than the outrageously high 9,319.4 gram suggested by the PSR." Objections at 10.

Third, Ramirez objects to the PSR's references to "other transactions alleged to have occurred between an undercover agent and Mr. Ramirez," because, according to Ramirez, "the Government denied access to discovery concerning any such alleged transactions." Objections at 10-12. Fourth, Ramirez argues that the PSR should give Ramirez an additional 2-level reduction under U.S.S.G. § 2D1.1(c)(18) -- the "safety valve" -- because Ramirez meets all five criteria for that reduction: (i) he has a limited criminal history; (ii) he does not possess a firearm during the underlying crime; (iii) the underlying offense does not result in death or serious bodily injury; (iv) he does not have an aggravating role in the offense; and (v) he provides the United States with "all information concerning the offense necessary to qualify for the safety valve." Objections at 12-13. In sum, Ramirez argues that his adjusted offense level should be 27 rather than 31,[5] because: (i) the correct drug quantity for which Ramirez is responsible is below 4.0 kilograms, which results in a base offense level of 32 rather than 34; and (ii) he should receive an additional 2-level reduction under U.S.S.G. § 2D1.1(c)(18). See Objections at 13.

### 3.    The Aragon Objections MOO.

On March 18, 2025, Ramirez' co-Defendant, Aragon, files objections to Aragon's PSR. See Defendant Isaiah Aragon's *Sealed* Sentencing Memorandum and Objections at 1, filed March 18, 2025 (Doc. 70)("Aragon's Objections"). Like Ramirez, Aragon argues that his base offense level should be 32, because only the seized pills and not the seized cash should count towards his

---

[5]The PSR reduces Ramirez' base offense level by 3 levels for acceptance of responsibly under U.S.S.G. §§ 3E1.1(a),(b). See PSR ¶¶ 30-31, at 7. Thus, as it stands, with a base offense level of 34, Ramirez' adjusted offense level is 31. See PSR ¶ 32, at 7.

drug quantity.  See Aragon's Objections at 5-6.  The Court disagrees with Aragon and overrules

his objections:

> The Court concludes that the PSR applies correctly a base offense level of 34, because a cash-to-drugs conversion for $60,070.00 is appropriate in Aragon's case, where the United States shows -- by a preponderance of the evidence -- that the seized cash comes from drug sales.  "[I]t is settled law in the Tenth Circuit that drug proceeds can be converted to their drug-weight equivalent."  United States v. Cervantes-Chavez, 59 F. Supp. 3d [1295,] 1317 [(D.N.M. 2014)(Browning, J.)].  "[C]ash-to-drugs conversions [are] appropriate where a preponderance of the evidence established that the cash attributable to uncharged drug activities resulted from the 'same course of conduct' or 'common scheme or plan' as the conviction."  United States v. Callejas, 66 F. App'x 826, 833 (10th Cir. 2003)(quoting United States v. Rios, 22 F.3d 1024, 1028 (10th Cir. 1994)).  Large cash amounts found on premises where drug trafficking defendants sell drugs are ripe for cash-to-drugs conversion, especially when a defendant offers no credible explanation for having that much cash.  See United States v. Hinson, 585 F.3d 1328, 1341 (10th Cir. 2009)(affirming cash-to-drugs conversion where police officers arresting a "long-term methamphetamine dealer who sold drugs out of his car" find over $40,000.00 in a shoebox in the defendant's car); United States v. Callejas, 66 F. App'x at 833-34 (affirming cash-to-drugs conversion for $5,010.00 in cash bundles found in the wall of a defendant's bathroom where the defendant was flushing drugs down the toilet and lies about earning the money from a clothing resale business); United States v. Cervantes-Chavez, 59 F. Supp. 3d at 1318 (attributing nearly $20,000.00 to drug sales, because the defendant "has advanced no alternative, licit reason for having that much cash," the cash is "discovered in a container in the same shed" as the seized drugs, and the defendant "was actively engaging in a large quantity drug transaction when he was apprehended").

> Here, Aragon exits his residence with 30,000 fentanyl pills to sell to an undercover officer.  See PSR ¶¶ 9-11, at 5.  Later that day, agents discover $60,070.00, neatly arranged in rubber-banded bundles, inside that same residence.  See PSR ¶12, at 5; Objections Response at 9.  Although Aragon notes that his romantic partner, Padilla, has a job and also lives at his residence, Aragon does not assert that the seized cash is Padilla's.  See Objections at 5-6.  Aragon also does not explain what Padilla's job is or how she earns $60,070.00 in cash.  See Objections at 5-6.  For example, Aragon does not introduce pay stubs, bank withdrawals, or a sworn affidavit from Padilla or her employer to show that the cash is Padilla's legitimate income.  The inference is strong: it is more likely than not that the $60,070.00 in cash bundles inside Aragon's residence are drug sales proceeds, and Aragon made that money from the same drug trafficking scheme for which he is convicted.

Aragon Objections MOO at 12-13.

4.      **The PSR Addendum**.

On May 15, 2025, the USPO files the PSR Addendum.  See PSR Addendum at 1.  The USPO "maintains the PSR was properly calculated," because Ramirez "is responsible for the cash proceeds located in Aragon's residence due to his participation in furtherance of the jointly undertaken criminal activity and the proceeds being a reasonably foreseeable result of this activity."  PSR Addendum at 1-2.  To support its position, the USPO highlights how the "case agent also advised they knew of additional occasions that Aragon supplied [Ramirez] with narcotics" and that Ramirez tells authorities, in a post-arrest statement, "that he buys 'boats' several times weekly from Aragon."  PSR Addendum at 2 (internal quotations have no citation).  The USPO asserts: "In the case of jointly undertaken criminal activity, the defendant may be held accountable for proceeds gained as a result of drug transactions by other participants for which they work with, whether any explicit or implicit agreement is inferred."  PSR Addendum at 2.  The USPO also notes how the Court overrules Aragon's similar objections and "found . . . that Aragon made that money from the same drug trafficking scheme for which he is convicted."  PSR Addendum at 2.  The USPO also stands by the conversion rate of $10.00 per gram, which is the price that "the defendant himself negotiated for the sale of 30,000 fentanyl pills."  PSR Addendum at 2.

5.      **The Objections Response**.

On May 27, 2025, the United States "respectfully requests that the Court overrule the Defendant's objections."  Objections Response at 1.  First, the United States argues that the "[i]dentification of co-defendant Aragon's residence as a stash house is appropriate," because "[i]t is not unreasonable to refer to a location as a stash house, particularly when items such as large quantities of cash, a money counter, and a digital scale were found at that location."  Objections Response at 2 (citing United States v. Roybal, 188 F. Supp. 3d 1163, 1210 (D.N.M. May 24,

2016)(Browning, J.)).  Second, the United States argues that the PSR's references to the cash, money counter, and digital scale in Aragon's apartment are appropriate, and that the PSR correctly attributes the converted cash to Ramirez as relevant conduct under U.S.S.G. § 1B1.3(a)(1)(B), because the converted cash is "within the scope of, in furtherance of, and reasonably foreseeable in" the drug conspiracy for which Ramirez is convicted.  Objections Response at 3-8.  To support this contention, the United States asserts:

> Here, the Defendant admitted to being involved in drug trafficking for approximately two years. He further admitted that he would buy a "boat," or 1,000 pills of fentanyl, several times a week from Aragon. Thus, not only does the evidence show that the money found in Aragon's residence is attributable to drug trafficking, but also that it was part of the drug trafficking scheme in which the Defendant was involved with Aragon. As such, the conversion from cash to drug quantity for the total offense level is appropriate.

Objections Response at 7.  On this issue, the United States also maintains that the $10.00 per gram conversion rate is appropriate, because it is "based on the profit the Defendant expected to receive from the sale."  Objections Response at 8.

Third, the United States insists that the PSR's references to other drug transactions are appropriate, because, based on the size of the controlled buy -- 30,000 fentanyl pills -- "there is a reasonable inference that this was not a first-time event of drug trafficking."  Objections Response at 8.  Moreover, the United States argues, Ramirez' admissions that he has been trafficking for two years and that he buys boats from Aragon several times a week corroborate the PSR's references to other transactions.  See Objections Response at 8.  On this issue, the United States does not address Ramirez' argument that the Court should not consider the other transactions, because, according to Ramirez, the United States has not provided discovery regarding those transactions. See Objections Response at 8.

Fourth, the United States maintains that Ramirez should not get the 2-level safety valve reduction.  See Objections Response at 8-11.  The United States asserts that the safety valve

reduction "requires disclosure of everything the defendant knows about his actions as well as the actions of any co-participants as well." Objections Response at 9 (citing <u>United States v. Acosta-Olivas</u>, 71 F.3d 375, 378 (10th Cir. 1995)). The United States insists that, in the context of a drug-conspiracy defendant, the safety valve reduction is available only to defendants who divulge "all information about a defendant's purchase of and distribution of drugs, including the identities of his customers." Objections Response at 10 (citing <u>United States v. Acosta-Olivas</u>, 71 F.3d at 379). The United States thus argues that, because Ramirez "has not provided a safety valve debriefing," Ramirez is not eligible for the 2-level reduction. Objections Response at 11. The United States also submits two recordings of Ramirez' post-arrest interview. <u>See</u> United States' Notice of Lodging of Exhibit 1 at 1, filed May 28, 2025 (Doc. 95). The interview lasts approximately thirty minutes, and, during the interview, Ramirez speaks with a DEA agent about some of his and Aragon's drug trafficking activities. <u>See</u> Miguel Ramirez Interview Part 1 at 0:00-15:09 (dated December 6, 2023)(Bates Number 51)("Post-Arrest Interview Part 1"); Miguel Ramirez Interview Part 2 at 0:00-15:14 (dated December 6, 2023)(Bates Number 52)("Post-Arrest Interview Part 2").

### 6.    <u>The Objection Withdrawal.</u>

On June 11, 2025, Ramirez withdraws one of his objections. <u>See</u> Sealed Notice Regarding Objection II to Presentence Report at 1, filed June 11, 2025 (Doc. 98)("Objection Withdrawal"). In the Objection Withdrawal, Ramirez withdraws "Objection II," which "was premised on non-disclosure of discovery." Objection Withdrawal at 1. Ramirez asserts that the United States "clarified the Probation Office was not provided discovery that was not also provided to the Defendant, and the proposed enhancement was based on previously disclosed materials only." Objection Withdrawal at 1. Thus, Ramirez withdraws his objection -- which challenges the PSR's references to other drug transactions -- "to the extent the enhancement which is the subject of Objection II is based on disclosed materials." <u>See</u> Objection Withdrawal at 1. Ramirez maintains,

however, that he does not waive the objection "if any determination is ultimately based upon review of information or materials not previously disclosed to Defendant." Objection Withdrawal at 1.

### LAW REGARDING OBJECTIONS TO A PRESENTENCE REPORT

Before the Court imposes a sentence, the USPO "must conduct a presentence investigation and submit a report to the court . . . ." Fed. R. Crim. P. 32(c)(1). A PSR must apply the advisory sentencing Guideline, meaning that it must:

(A)    identify all applicable guidelines and policy statements of the Sentencing Commission;

(B)    calculate the defendant's offense level and criminal history category;

(C)    state the resulting sentencing range and kinds of sentences available;

(D)    identify any factor relevant to:

　　(i)    the appropriate kind of sentence, or

　　(ii)    the appropriate sentence within the applicable sentencing range; and

　　(iii)    identify any basis for departing from the applicable sentencing range.

Fed. R. Crim. P. 32(d)(1). A presentence report also must provide additional information, including:

(A)    the defendant's history and characteristics, including:

　　(i)    any prior criminal record;

　　(ii)    the defendant's financial condition; and

　　(iii)    any circumstances affecting the defendant's behavior that may be helpful in imposing sentence or in correctional treatment;

(B)    information that assesses any financial, social, psychological, and medical impact on any victim;

(C)    when appropriate, the nature and extent of nonprison programs and resources available to the defendant;

(D)    when the law provides for restitution, information sufficient for a restitution order;

(E)    if the court orders a study under 18 U.S.C. § 3552 (b), any resulting report and recommendation;

(F)    a statement of whether the government seeks forfeiture under Rule 32.2 and any other law; and

(G)    any other information that the court requires, including information relevant to the factors under 18 U.S.C. § 3553(a).

Fed. R. Crim. P. 32(d)(2).

After the USPO files a PSR, the parties have an opportunity to object to the report.  See Fed. R. Crim. P. 32(f).  Parties must make their objections in writing within fourteen days of receiving the PSR.  See Fed. R. Crim. P. 32(f)(1).  Parties may object to many aspects of the PSR, "including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report."  Fed. R. Crim. P. 32(f)(1).  For example, a party can object to a PSR's statement of facts.  See, e.g., United States v. Garcia, No. CR 20-1370 KWR, 2022 WL 2341670, at *1 (D.N.M. June 29, 2022)(Riggs, J.)(sustaining in part and overruling in part a defendant's objections that a PSR misstates material facts regarding the posted speed limit and the circumstances surrounding the victim's injuries).  If a party raises a factual objection, it must present "information to cast doubt on" the PSR's recitation of the facts.  See United States v. Yates, 22 F.3d 981, 989 (10th Cir. 1994).  A party also can object that the USPO miscalculates a defendant's criminal history category.  See, e.g., United States v. Chavez, No. CR 18-0836 JB, 2018 WL 6621283, at *1 (D.N.M. December 18, 2018)(Browning, J.)(addressing a defendant's objections that the Court should reduce his criminal history score by several points).  Similarly, a party can object that a PSR impermissibly applies a base-offense-level enhancement, see, e.g., United States v. Casias-Grove, No. 22-0109 JB, 2022 WL 17830249, at *1 (D.N.M. December 21, 2022)(Browning, J.)(sustaining a defendant's objection that the PSR impermissibly applies a 4-

level enhancement to his base-offense-level); that the PSR should have applied an additional base-offense-level enhancement, see, e.g., United States v. Talk, No. CR 19-1994 JB, 2021 WL 1978624, at * 1 (D.N.M. May 18, 2021)(Browning, J.)(sustaining the United States' objection that the PSR should have applied a 4-level enhancement to the defendant's base offense level); or that the PSR should have applied a base offense level decrease, see, e.g., United States v. Pena, Nos. CR 19-3609 JB, CR 19-3611 JB, 2022 WL 16924000, at *1 (D.N.M. November 13, 2022)(Browning, J.)(sustaining the parties' objections that the PSR should have applied a 2-level reduction to the defendant's base offense level).

Ideally, the parties and the USPO can work through objections without the Court's assistance. Rule 32(f)(3) establishes: "After receiving objections, the probation officer may meet with the parties to discuss the objections. The probation officer may then investigate further and revise the presentence report as appropriate." Fed. R. Civ. P. 32(f)(3). In keeping with rule 32(f)(3), long ago in the District of New Mexico, the Court, the United States Attorney's Office, and the Federal Public Defender's Office agreed that, if there are objections, counsel first will talk to the USPO and see if they can work to address the objections independently. If the parties and the USPO cannot work out an objection, then the parties may file an objection with the Court. If the parties and the USPO cannot resolve an objection, rule 32(g) establishes that, "[a]t least 7 days before sentencing, the probation officer must submit to the court and to the parties the presentence report and an addendum containing any unresolved objections, the grounds for those objections, and the probation officer's comments on them." Fed. R. Crim. P. 32(g).

If the parties and the USPO cannot resolve an objection on their own, the Court "must . . . rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). When resolving factual objections, the court must determine whether the

United States has met its burden of proving disputed facts by a preponderance of the evidence. See United States v. Munoz-Tello, 531 F.3d 1174 (10th Cir. 2008).  Similarly, in considering objections to enhancements to a defendant's criminal history category or base offense level, the court must determine whether the United States has met its burden of showing that a particular enhancement applies by a preponderance of the evidence.[6]  See United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.).  The Court may base its conclusion "on evidence presented at trial, undisputed statements in the PSR, and evidence presented at the sentenc[ing] hearing."  United States v. Garcia, 2022 WL 2341670, at *2 (quoting United States v. White, 663 F.3d 1207, 1216 (11th Cir. 2011)).

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court of the United States reaffirms the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute."  530 U.S. at 481 (emphasis in original).  The Supreme Court cautions, however, that the Constitution of the United States of America limits this discretion and that the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborates on its holding in Apprendi v. New Jersey, stating that the "'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  Blakely v. Washington, 542 U.S. at

---

[6]There is some nuance regarding the applicable burden of proof required for sentencing enhancements, which the Court discusses in greater detail in the next section.

303 (emphasis in original)(first citing <u>Ring v. Arizona</u>, 536 U.S. 584, 602 (2002); and then citing

<u>Harris v. United States</u>, 536 U.S. 545, 563 (2002)(plurality opinion), <u>overruled by</u> <u>Alleyne v.</u>

<u>United States</u>, 570 U.S. 99 (2012)).  In <u>United States v. Booker</u>, however, the Supreme Court holds

that, because the sentencing guideline ranges are no longer mandatory, "<u>Apprendi</u> does not apply

to the present advisory-Guidelines regime."  <u>United States v. Ray</u>, 704 F.3d 1307, 1314 (10th Cir.

2013)(citing <u>United States v. Booker</u>, 543 U.S. at 259).  <u>See</u> <u>United States v. Booker</u>, 543 U.S. at

259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the

relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing

judges' -- the statute falls outside the scope of <u>Apprendi</u>'s requirement."  (quoting <u>United States</u>

<u>v. Booker</u>, 543 U.S. at 221)(<u>United States v. Booker</u> adds second alteration)).  More recently, the

Supreme Court holds that the <u>Apprendi v. New Jersey</u> requirements apply to facts that increase a

defendant's mandatory minimum sentence.  <u>See</u> <u>Alleyne v. United States</u>, 570 U.S. at 103.

        In <u>United States v. Magallanez</u>, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit holds that

<u>Blakely v. Washington</u> and <u>United States v. Booker</u> do not change the district court's

enhancement-findings analysis.  <u>See</u> <u>United States v. Magallanez</u>, 408 F.3d at 684-85.  <u>United</u>

<u>States v. Magallanez</u> involves plain-error review of a drug sentence in which a jury finds the

defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute

methamphetamine.  <u>See</u> 408 F.3d at 676.  As part of its verdict, the jury, through a special

interrogatory, attributes to the defendant 50 to 500 grams of methamphetamine; at sentencing,

however, the judge -- based on the testimony of the United States' witnesses about the various

amounts that they had sold to the defendant -- attributes 1,200 grams of methamphetamine to the

defendant and uses that amount to calculate his sentence under the Guidelines.  <u>See</u> <u>United States</u>

<u>v. Magallanez</u>, 408 F.3d at 682.  The district court's findings increase the defendant's Guidelines

sentencing range from 63 to 78 months, based on the jury's 50 grams amount, to 121 to 151

months, based on the judge's 1,200 grams amount.  See United States v. Magallanez, 408 F.3d at

682-83.  On appeal, the Tenth Circuit states that, both before and after Congress' passage of the

"Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of

a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."

United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker makes the

Guidelines ranges "effectively advisory," United States v. Booker, 543 U.S. at 245, the Tenth

Circuit reaffirms that "district courts are still required to consider Guideline ranges, which are

determined through application of the preponderance standard, just as they were before."  United

States v. Magallanez, 408 F.3d at 685.

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a

dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held

that sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United

States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11

F.3d 1510, 1516 (10th Cir. 1993)).[7]  "[T]he application of an enhancement . . . does not implicate

---

[7]Although the Tenth Circuit states in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit since characterizes its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not found yet that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is necessary to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement does not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation).  See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitles the defendant to a clear-and-convincing evidence

the Supreme Court's holding in <u>Apprendi v. New Jersey</u>." <u>United States v. Reyes-Vencomo</u>, No. CR 11-2563 JB, 2012 WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies <u>Apprendi v. New Jersey</u>'s requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." <u>United States v. Price</u>, 400 F.3d 844, 847 (10th Cir. 2005). <u>Accord</u> <u>United States v. Ray</u>, 704 F.3d at 1314. A defendant may assert an error under <u>Apprendi v. New Jersey</u> only where the fact at issue increases his or her sentence beyond the statutory maximum. <u>See</u> <u>United States v. O'Flanagan</u>, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not assert an error under <u>Apprendi v. New Jersey</u>, because "his sentence does not exceed the statutory maximum"); <u>United States v. Hendrickson</u>, 592 F. App'x 699, 705 (10th Cir. 2014)(unpublished) (holding that, after <u>Alleyne v. United States</u>, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence"). The Court notes:

> [A]lthough the decision of the Supreme Court of the United States in <u>Alleyne v. United States</u> . . . expands the rule from <u>Apprendi v. New Jersey</u>, . . . (holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence. <u>See</u> [<u>United States v. Sangiovanni</u>, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. August 29, 2014)(Browning, J.)].

_____

standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); <u>United States v. Washington</u>, 11 F.3d at 1516 (concluding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributes, even though its findings increase the defendant's sentence from twenty years to consecutive forty-year terms). Subsequent to <u>United States v. Washington</u>, the Tenth Circuit reiterates the position that preponderance of the evidence is the proper standard, stating: "The Supreme Court has not adopted a heightened standard of proof at sentencing for contested facts, thus we hold that the correct standard of proof in this case was a preponderance of the evidence. This issue has been foreclosed in this Circuit." <u>United States v. Robertson</u>, 946 F.3d 1168, 1171 (10th Cir. 2020)(citing <u>United States v. Constantine</u>, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)).

United States v. Cervantes-Chavez, 59 F. Supp. 3d at 1315.  The Supreme Court has clarified that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the legally prescribed penalty.' . . . And under our Constitution, when 'a finding of fact alters the legally prescribed punishment so as to aggravate it,' that finding must be made by a jury of the defendant's peers beyond a reasonable doubt."   United States v. Haymond, 588 U.S. 634, 645 (2019)(quoting Alleyne v. United States, 570 U.S. at 112-14).  Further, the Tenth Circuit has determined that a district court can use its own finding on drug quantity to enhance a defendant's Guidelines range consistent with Alleyne v. United States, "so long as the court does not use its own drug quantity finding to alter the defendant's statutory sentencing range."  United States v. Cassius, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, n.1(I).  In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court notes:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis, alterations, and first ellipsis in original; second ellipses added by this District Court)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be determined" based on the following:

> (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2)    solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> (3)    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4)    any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The Guidelines "allow courts to consider conduct which is not formally charged or is not an element of the offense of conviction." United States v. Tagore, 158 F.3d 1124, 1128 (10th Cir. 1998).  Conduct is relevant when it is "the same type of conduct," or part of "the same scheme or plan," as the conviction offenses. United States v. Custodio, 39 F.3d 1121, 1126 (10th Cir. 1994).  The conduct that a sentencing court may consider, therefore, "comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct." United States v. Allen, 488 F.3d 1244, 1254-55 (10th Cir. 2007).  "Section 1B1.3 embodies the principle that the sentence should reflect the offense's seriousness, and so courts should consider all conduct relevant to determining that seriousness."

United States v. Nissen, 492 F. Supp. 3d 1254, 1272 (D.N.M. 2020)(Browning, J.)(citing United States v. Allen, 488 F.3d at 1255).

Pursuant to U.S.S.G. § 6A1.3's commentary, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct. See U.S.S.G. § 6A1.3 cmt. The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning, J.), aff'd, 523 F.3d 1258 (10th Cir. 2008). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct consists primarily of two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997). In Witte v. United States, the Supreme Court upholds the use of uncharged conduct at sentencing against a double-jeopardy challenge. See 515 U.S. at 404-06. The defendant in Witte v. United States had been involved in an unsuccessful attempt to import marijuana and cocaine into the United States in 1990, and in an attempt to import marijuana in 1991. See 515 U.S. at 392-93. In March 1991, a federal grand jury indicts the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's later attempt to import narcotics. See 515 U.S. at 392-93. At sentencing, the district court concludes that, because the 1990 attempt is part of the continuing conspiracy, it is relevant conduct under U.S.S.G. § 1B1.3, and thus calculates the

defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicts the defendant for conspiring and attempting to import cocaine in association with his activities in 1990.  See 515 U.S. at 392-93. The defendant moves to dismiss the indictment, contending that he already has been punished for the cocaine offenses, because the district court considers those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agrees and dismisses the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution.  See Witte v. United States, 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reverses and holds that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Wittie, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledges that its conclusion is contrary to other United States Courts of Appeals opinions, including a United States Court of Appeals for the Tenth Circuit opinion, that had previously considered this question.  See United States v. Wittie, 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court grants certiorari to resolve the conflict between the Courts of Appeals and affirms the Fifth Circuit's decision.  See Witte v. United States, 515 U.S. at 395.  In holding that a district court's consideration of the defendant's relevant conduct does not punish the defendant for that conduct, the Supreme Court concludes that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401 (internal quotations have no citation).  The Supreme Court reasons that sentencing courts always have considered

relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense." 515 U.S. at 402. Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity." Witte v. United States, 515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relies upon Witte v. United States and upholds, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant has been acquitted. See United States v. Watts, 519 U.S. at 149. The Supreme Court notes that its conclusion is in accord with every United States Court of Appeals other than United States Court of Appeals for the Ninth Circuit, and that each Court of Appeals previously holds that a sentencing court may consider conduct for which the defendant has been acquitted, if the government establishes that conduct by a preponderance of the evidence. See United States v. Watts, 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)). The Supreme Court begins its analysis with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." United States v. Watts, 519 U.S. at 151 (quoting 18 U.S.C. § 3661). According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.

- 23 -

Tenth Circuit caselaw adheres closely to the Supreme Court's results in Witte v. United States and in United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause).  In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006), the Tenth Circuit rejects a defendant's argument that it is "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explains that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  United States v. Banda, 168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In  United States v. Coleman, the defendant appeals the district court's sentence enhancement for firearms possession after he is convicted of conspiracy to possess and possession of a controlled substance with intent to distribute but is acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledges that courts have taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal on firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(Green, J.)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).  Without discussion related to the standard of

proof that a sentencing court should use to make factual findings, the Tenth Circuit holds that the district court does not err in enhancing the defendant's sentence for possession of a firearm. See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit bases its conclusion on evidence that: (i) individuals at the arrest scene handle the weapons; (ii) individuals who live at the house handle the weapons; and (iii) the weapons are kept for the protection of conspiracy participants and the narcotics involved. See 947 F.2d at 1429. The Tenth Circuit summarizes that, in reviewing relevant federal case law, it finds "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." 947 F.2d at 1429.

In United States v. Washington, 11 F.3d at 1510, the defendant argues that the United States needs to prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence. See 11 F.3d at 1512. The defendant objects to his sentencing, because the drug quantity that the district court considers as relevant conduct, and which the court finds by a preponderance of the evidence, increases his Guidelines sentencing range from 210-262 months to life in prison. See 11 F.3d at 1515. The defendant argues "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required." United States v. Washington, 11 F.3d at 1515. Although the Tenth Circuit in United States v. Washington "recognize[s] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it holds that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." 11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)). See United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1319 (D.N.M. 2014)(Browning, J.)(cross-referencing from the Guidelines for being an illegal alien in possession of a firearm to the Guidelines for drug-possession after finding

by a preponderance of the evidence that the defendant committed a drug-possession crime); <u>United States v. Sangiovanni</u>, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. August 29, 2014)(Browning, J.)(concluding that a sentencing court can cross-reference from the Guidelines that correspond to the defendant's crime of conviction to the Guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime);

The Court holds that it may consider a defendant's refusal to answer questions for the PSR, while not drawing an adverse inference from the refusal. <u>See</u> <u>United States v. Goree</u>, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. February 13, 2012)(Browning, J.). The Court also holds that, although it can consider a defendant's silence about information regarding herself or others engaging in criminal conduct, it will not rely on that silence to increase the defendant's sentence. <u>See</u> <u>United States v. Chapman</u>, No. CR 11-0904 JB, 2012 WL 2574814, at *13 n.5 (D.N.M. June 22, 2012)(Browning, J.). Finally, the Court holds that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence. <u>United States v. Romero</u>, No. CR 09-1253 JB, 2012 WL 6632493, at *23 (D.N.M. December 6, 2012)(Browning, J.). <u>See</u> <u>United States v. Tapia</u>, No. CR 12-3012 JB, 2017 WL 6417610, at *10-15 (D.N.M. December 14, 2017)(Browning, J.).

## LAW REGARDING THE SAFETY-VALVE PROVISION, U.S.S.G. §§ 2D1.1(B)(18) AND 5C1.2(A)(2)

U.S.S.G. § 2D1.1(b)(18), sometimes referred to as the "safety-valve" provision, <u>United States v. Garcia</u>, 939 F. Supp. 2d 1216, 1230 (D.N.M. 2013)(Browning, J.), provides: "If the defendant meets the criteria set forth in subdivisions (1)-(5) of subsection (a) of § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases), decrease by 2 levels." U.S.S.G. § 2D1.1(b)(18). U.S.S.G. § 5C1.2(a) provides:

(a)    Except as provided in subsection (b), in the case of an offense under 21 U.S.C. § 841, § 844, § 846, § 960, or § 963, the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)-(5) set forth below:

(1)    the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines before application of subsection (b) of § 4A1.3 (Departures Based on Inadequacy of Criminal History Category);

(2)    the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3)    the offense did not result in death or serious bodily injury to any person;

(4)    the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

(5)    not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

U.S.S.G. § 5C1.2(a). The Court has evaluated U.S.S.G. § 2D1.1(b)(18)'s 2-level safety-valve reduction on several occasions. See United States v. Castillo-Nava, 347 F. Supp. 3d 743, 747 (D.N.M. 2018)(Browning, J.)(applying the 2-level safety-valve reduction to a drug trafficking defendant, where "no firearm was recovered at the time of [the defendant's] arrest"); United States v. Morales-Mejia, No. CR 19-2847 JB, 2021 WL 5332325, at *6 (D.N.M. Nov. 16,

2021)(Browning, J.)(applying the 2-level safety-valve reduction to a drug trafficking defendant, where the Court concludes that the defendant does not possess a firearm in connection with his drug offense, because, although the defendant shows an undercover agent a firearm during a drug transaction and says, "Look what I got," the defendant allows the undercover agent to hold the firearm while the defendant counts the money); United States v. Candelaria, No. CR 13-0957 JB, 2014 WL 4349788, at *7 (D.N.M. Aug. 29, 2014)(Browning, J.)(declining to apply the 2-level safety-valve reduction to a drug trafficking defendant who keeps a firearm in the same backpack he uses to carry the drugs he intends to sell).

## ANALYSIS

The Court undertakes its analysis in two parts.  First, the Court sustains Ramirez' objection regarding the PSR's cash-to-drugs conversion, because the cash in Aragon's residence is not relevant conduct for Ramirez' sentencing.   Second, the Court overrules Ramirez' objection regarding the safety-valve reduction, because Ramirez has not debriefed sufficiently with the United States.

## I.    RAMIREZ IS NOT RESPONSIBLE FOR THE CASH IN ARAGON'S APARTMENT.

The Court sustains Ramirez' objection regarding the PSR's cash-to-drugs conversion, because the cash in Aragon's residence is not relevant conduct for Ramirez' sentencing.  "Under the Sentencing Guidelines, the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction."  Witte v. United States, 515 U.S. at 393 (quoting U.S.S.G. § 1B1.3).  For "jointly undertaken criminal activity," relevant conduct includes "all acts and omissions of others" that are: (i) "within the scope of the jointly undertaken criminal activity"; (ii) "in furtherance of that criminal activity"; and (iii) "reasonably foreseeable in connection with that criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B).  See United States v. Patton, 927 F.3d 1087,

1091 (10th Cir. 2019); United States v. Ramirez, No. CR 18-03890 JB, 2024 WL 4203343, at *3

(D.N.M. Sept. 16, 2024)(Browning, J.).  When a lower-level drug dealer does not pool resources

with a higher-level dealer or otherwise assist with a higher-level dealer's drug trafficking activities,

the higher-level dealer's separate drug proceeds are not relevant conduct under § 1B1.3(a)(1)(B).

See United States v. McReynolds, 69 F.4th 326, 333 (6th Cir. 2023)(reversing a district court's

attribution of "conspiracy-wide drug quantities" to a defendant who buys smaller quantities of

drugs from a higher-level dealer to sell to other customers, where the United States neither

establishes "modus operandi, coordination of activities among schemers, or a pooling of resources

or profits," nor introduces any physical evidence connecting the defendant to the "conspiracy-wide

drug quantity," like "drug ledgers, fingerprints, personal items or documentation").  Cf. United

States v. Ellis, 23 F.4th 1228, 1248 (10th Cir. 2022)(concluding that a defendant is responsible for

drugs that his co-conspirator purchases, where the two men share a residence -- as evidenced by

the fact that the defendant leases the residence with the co-conspirator's financial assistance -- for

the purpose of drug distribution, pool resources to facilitate their drug-trafficking activities, share

a cellular telephone to communicate with their customers, and jointly pay for a doorman at the

shared residence).

Here, Ramirez is a lower-level drug dealer who, by his own admission,[8] buys a few

thousand pills of fentanyl from Aragon each week.  See PSR ¶ 14, at 6.  The United States does

_____

[8]Although Ramirez withdraws his objection regarding the PSR's references to other drug
transactions, the Court would overrule that objection.  In the original objection, Ramirez asks the
Court to not consider the PSR's references to other drug transactions.  See Objections at 10-12.
Ramirez does not deny, however, that those transactions take place, or deny that he tells officers
about those transactions during his post-arrest interview.  See Objections at 10-12.  Instead,
Ramirez argues that the Court should not consider those transactions, because the United States
does not provide Ramirez with requested discovery regarding those transactions.  See Objections
at 10-12.  Ramirez does not provide, however, any authority for his proposition that a district court
should not consider a PSR's statements when the United States does not provide a defendant with
some discovery regarding those statements.  See Objections at 11.  The Court also notes that in a
case like this one, where the defendant enters a plea agreement, the defendant is not entitled to all

not uncover any items tying Ramirez to Aragon's residence, nor does the United States introduce any evidence suggesting that Ramirez uses Aragon's residence to sell drugs, that Ramirez helps Aragon conduct large-scale drug trafficking, or that Ramirez and Aragon pool resources or share customers.  See PSR ¶¶ 10-17, at 5-6.  Accordingly, the Court concludes that the United States does not prove -- by a preponderance of the evidence -- that Ramirez is responsible for the full $60,700.00 in cash at Aragon's apartment.

The Guidelines provide several examples that illustrate the principle that a lower-level drug dealer is not responsible for conspiracy-wide drug quantities.  In one example:

> Defendant K is a wholesale distributor of child pornography.  Defendant L is a retail-level dealer who purchases child pornography from Defendant K and resells it, but otherwise operates independently of Defendant K.  Similarly, Defendant M is a retail-level dealer who purchases child pornography from Defendant K and resells it, but otherwise operates independently of Defendant K.  Defendants L and M are aware of each other's criminal activity but operate independently. Defendant N is Defendant K's assistant who recruits customers for Defendant K and frequently supervises the deliveries to Defendant K's customers.  Each defendant is convicted of a count charging conspiracy to distribute child pornography.  Defendant K is accountable under subsection (a)(1)(A) for the entire quantity of child pornography sold to Defendants L and M.  Defendant N also is accountable for the entire quantity sold to those defendants under subsection (a)(1)(B) because the entire quantity was within the scope of his jointly undertaken criminal activity (to distribute child pornography with Defendant K), in furtherance of that criminal activity, and reasonably foreseeable.  Defendant L is accountable under subsection (a)(1)(A) only for the quantity of child pornography that he purchased from Defendant K because he is not engaged in a jointly undertaken criminal activity with the other defendants.  For the same reason, Defendant M is accountable under subsection (a)(1)(A) only for the quantity of child pornography that he purchased from Defendant K.

U.S.S.G. § 1B1.3(a)(1)(B) Application Note 4(C)(iv).  Here, Ramirez is like Defendants L and M: retail-level dealers who purchase illegal products from a wholesale supplier, and, other than those

---

material discovery.  See United States v. Ruiz, 536 U.S. 622, 633 (2002)(holding that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant").  Accordingly, even if Ramirez does not withdraw the objection regarding the PSR's references to other drug transactions, the Court would overrule that objection and conclude that the Court may consider the PSR's references to other drug transactions.

transactions, operate independently of the wholesale supplier.  See PSR ¶¶ 10-17, at 5-6.  Like

Defendants L and M, Ramirez is responsible only for the illegal products that he purchases from

Aragon, the wholesale supplier.  See U.S.S.G. § 1B1.3(a)(1)(B) Application Note 4(C)(iv).

In another Guidelines example:

> Defendant P is a street-level drug dealer who knows of other street-level
> drug dealers in the same geographic area who sell the same type of drug as he sells.
> Defendant P and the other dealers share a common source of supply, but otherwise
> operate independently.  Defendant P is not accountable for the quantities of drugs
> sold by the other street-level drug dealers because he is not engaged in a jointly
> undertaken criminal activity with them.  In contrast, Defendant Q, another street-
> level drug dealer, pools his resources and profits with four other street-level drug
> dealers.  Defendant Q is engaged in a jointly undertaken criminal activity and,
> therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs
> sold by the four other dealers during the course of his joint undertaking with them
> because those sales were within the scope of the jointly undertaken criminal
> activity, in furtherance of that criminal activity, and reasonably foreseeable in
> connection with that criminal activity.

U.S.S.G. § 1B1.3(a)(1)(B) Application Note 4(C)(vi).  Here, Ramirez is like Defendant P and is

not like Defendant Q, because Ramirez does not pool resources or profits with Aragon.  See

PSR ¶¶ 10-17, at 5-6.  Like Defendant P, Ramirez is responsible only for the drugs that he sells.

See U.S.S.G. § 1B1.3(a)(1)(B) Application Note 4(C)(vi).  In another example:

> Defendant R recruits Defendant S to distribute 500 grams of cocaine.
> Defendant S knows that Defendant R is the prime figure in a conspiracy involved
> in importing much larger quantities of cocaine. As long as Defendant S's agreement
> and conduct is limited to the distribution of the 500 grams, Defendant S is
> accountable only for that 500 gram amount (under subsection (a)(1)(A)), rather than
> the much larger quantity imported by Defendant R.  Defendant S is not accountable
> under subsection (a)(1)(B) for the other quantities imported by Defendant R
> because those quantities were not within the scope of his jointly undertaken
> criminal activity (i.e., the 500 grams).

U.S.S.G. § 1B1.3(a)(1)(B) Application Note 4(C)(vii).  Here, Ramirez is like Defendant S,

because, although he knows that Aragon -- Defendant R's analogue -- is involved in trafficking

much larger drug quantities, Ramirez' "agreement and conduct is limited to the distribution" of

the drugs that he purchases from Aragon.  U.S.S.G. § 1B1.3(a)(1)(B) Application Note 4(C)(vii).

See PSR ¶¶ 10-17, at 5-6.  In sum, case law in the Tenth Circuit and other Courts of Appeals, as well as the Guidelines Application Notes, all point in the same direction: when the United States does not introduce evidence tying a lower-level drug dealer to a broader drug trafficking operation, the lower-level drug dealer is not responsible for his supplier's larger drug quantities. Accordingly, the Court sustains Ramirez' objection regarding the PSR's cash-to-drugs conversion and concludes that his base offense level should be 32 and not 34, because Aragon's converted cash is not relevant conduct for Ramirez, under U.S.S.G. § 1B1.3(a)(1)(B).[9]

At most, Ramirez' admission that he buys several boats per week, at $350.00 per boat, suggests that a small segment of Aragon's $60,700.00 may come from Ramirez.  But the United States does not introduce evidence, however, that shows, by a preponderance of the evidence, how much of that cash comes from Ramirez.  To maintain Ramirez' base offense level of 34, Ramirez'

---

[9]Separately, the Court overrules Ramirez' objection regarding the PSR's conversion rate. See Objections at 9-10.  Ramirez argues that, even if the cash is attributable to Ramirez, the PSR uses an "unreliable conversion rate . . . to unreasonably inflate the drug quantity calculation." Objections at 9.  Ramirez argues that the United States' proposed conversion rate of $10.00 per gram -- which is based on the controlled purchase price -- "does not reflect the United States Government's public declarations of the value of fentanyl."  Objections at 9.  Citing reports and press releases that the Interior Department and the Drug Enforcement Agency published, Ramirez argues that the conversion rate should be between $142.50 and $200.00 per gram, which "would place the total drug quantity at 3,552 grams to 3,645 grams rather than the outrageously high 9,319.4 gram suggested by the PSR."  Objections at 10.

The Court disagrees with Ramirez.  The PSR's conversion rate of $10.00 per gram is reasonable, because it is based on the actual price that the undercover agent and Ramirez set for the controlled buy in Albuquerque.  See United States v. Mitchell, 528 F. App'x 800, 803-04 (10th Cir. 2013)(affirming cash-to-drugs conversion rate based on the "actual prices that [the defendant] charged the confidential informant in the two controlled buys" underlying the conviction, rather than based on DEA statistics regarding seized drug prices); U.S.S.G. § 2D1.1 cmt. 5 (providing that district courts converting cash to drugs may consider "similar transactions in controlled substances by the defendant").  Accordingly, the Court overrules Ramirez' objection regarding the PSR's conversion rate.  Because the Court sustains Ramirez' objection regarding the PSR's cash-to-drugs conversion and concludes that Aragon's converted cash is not relevant conduct for Ramirez, however, the Court's conclusion regarding the PSR's conversion rate does not affect Ramirez' Guidelines range, given that Ramirez is responsible only for the 3,217.0-gram controlled buy.  See supra, at 29-33.

small boat purchases need to account for more than 783.0 grams of fentanyl, which, including the 3,217.0 gram controlled buy, push Ramirez over U.S.S.G. §§ 2D1.1(c)'s four-kilogram line.  <u>See</u> U.S.S.G. §§ 2D1.1(c).  The PSR states that each pill has approximately 0.1 grams of fentanyl.  <u>See</u> PSR ¶ 16, at 6.  To reach 783.0 grams, Ramirez must purchase 8,000 pills or 8 boats.  If he buys several boats a week, Ramirez could reach 800.0 grams within two or three weeks, depending on what "several" means.  PSR ¶ 14, at 6.

Although it is possible that Ramirez has purchased this much fentanyl from Aragon, Ramirez' vague post-arrest statement about his purchasing habits is not enough to prove, by a preponderance of the evidence, that Ramirez is responsible for more than four kilograms of fentanyl.  To assign more drug quantity to Ramirez, the United States must introduce evidence that particularizes and explains how much fentanyl Ramirez has purchased from Aragon, outside of the controlled buy.  <u>See</u> <u>United States v. Figueroa-Labrada</u>, 720 F.3d 1258, 1265-67 (10th Cir. 2013)(reversing and remanding the district court's calculation of methamphetamine attributable to the defendant, where the district court adopts a PSR's factual findings, even though the PSR does not "contain particularized findings" regarding attributable drug amounts, or "explain how the amount of drugs that it attributed to him was reasonably foreseeable and within the scope of his jointly undertaken criminal activity").  Other than pointing to Ramirez' vague post-arrest statements, the United States neither particularizes nor explains how much fentanyl, outside of the controlled buy, Ramirez purchases from Aragon.  <u>See</u> PSR ¶¶ 10-17, at 5-6.  Without more, the Court cannot say soundly that the United States carries its burden to prove -- by a preponderance of the evidence -- that Ramirez is responsible for more than four kilograms of fentanyl.

## II.    RAMIREZ DOES NOT QUALIFY FOR THE 2-LEVEL SAFETY-VALVE <u>REDUCTION</u>.

The Court overrules Ramirez' objection regarding USPO's decision to not include a 2-level safety-valve reduction.  Ramirez does not qualify for the safety-valve reduction, because he

does not provide enough information concerning the underlying drug conspiracy.  A defendant qualifies for the 2-level safety-valve reduction if he satisfies five conditions: (i) he does not have more than 1 criminal history point; (ii) he does not use violence, credible threats of violence, or possess a firearm or other dangerous weapon in connection with the underlying offense; (iii) the underlying offense does not result in death or serious bodily injury; (iv) he is not an organizer, leader, manager, or supervisor of others in the underlying offense; and (v) he has "truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan."  U.S.S.G. § 5C1.2(a).  The parties dispute only the fifth requirement.  See Objections at 12-13; Objections Response at 8-11.  Ramirez asserts that he has provided enough information to qualify for the 2-level safety-valve reduction:

> After his arrest, Mr. Ramirez was interviewed at length by agents. He was forthcoming about his activities and answered all questions posed to him. He informed agents how he obtained narcotics and from whom. He discussed the confidential informant, his phones, vehicles, etc. Every request for information from agents was met with a response.  He even worked to provide agents access to his communication device. Mr. Ramirez provided the requisite information.  He provided the when, where, who and how.  A two-level safety valve reduction should be noted in the PSR.

Objections Response at 13.  The United States argues that Ramirez "has not provided a safety valve debriefing and, as such, has not established eligibility for the two-level reduction." Objections Response at 11.

Ramirez' post-arrest interview is not enough to qualify for the 2-level safety-valve reduction.  "The defendant bears the burden of proving by a preponderance of the evidence that he is entitled to the safety-valve adjustment."  United States v. Stephenson, 452 F.3d 1173, 1179 (10th Cir. 2006).  "When the offense involves conspiracy or a jointly undertaken criminal venture, we require the defendant to disclose not only everything he knows about his own actions, but also everything he knows about his co-conspirators."  United States v. Stephenson, 452 F.3d at 1180

(declining to apply the safety-valve reduction to a conspiracy defendant who does not "disclose the roles and identity of other participants").

> Absent a favorable recommendation from the government, a defendant needs to put on evidence at the sentencing hearing to meet his burden of showing that he truthfully and fully disclosed everything he knew and to rebut government claims to the contrary. This evidence may include proffer documents, stipulated facts, or, in all likelihood, testimony from the defendant or a representative of the government subject to cross-examination.

United States v. Cervantes, 519 F.3d 1254, 1258 (10th Cir. 2008)(declining to apply the safety-valve reduction where the defendant's counsel represents that the defendant's disclosure was truthful and complete, but the United States asserts that his disclosure is neither truthful nor sufficient). Statements made to law enforcement officers during a post-arrest interview do not qualify for the 2-level safety-valve reduction; the defendant must proffer information to a prosecutor and not an arresting officer or probation officer. See United States v. Cervantes, 519 F.3d at 1257 (holding that a defendant's disclosures to a probation officer are insufficient for the safety-valve reduction, because § 5C1.2(a)(5)'s reference to the "'Government' clearly means 'prosecuting authority,' or Assistant U.S. Attorney"); United States v. Contreras, 136 F.3d 1245, 1246 (9th Cir. 1998), as amended (March 25, 1998)(holding that § 5C1.2(a)(5)'s reference to "the Government" means that the defendant must speak with "the government's attorney"). Ramirez does not assert that he provided any information to a prosecutor; nor does he "put on evidence" showing that he "truthfully and fully disclosed everything he knew." United States v. Cervantes, 519 F.3d at 1258. The statements of Ramirez' counsel are not evidence. See United States v. Cervantes, 519 F.3d at 1258. Those statements do not meet Ramirez' burden to show -- by a preponderance of the evidence -- that, contrary to the United States' position, he "disclose[d] not only everything he knows about his own actions, but also everything he knows about his co-conspirators" to a prosecutor. United States v. Stephenson, 452 F.3d at 1180. Accordingly, the

Court overrules Ramirez' objection regarding the safety-valve reduction and concludes that Ramirez does not qualify for the 2-level safety-valve reduction.[10]

**IT IS ORDERED** that: (i) Defendant Miguel Antonio Ramirez' objection in the Defendant's Sealed Objections to the Presentencing Report, filed May 12, 2025 (Doc. 82)("Objections"), regarding the PSR's cash-to-drugs conversion is sustained; (ii) the objection in the Objections regarding the PSR's references to other drug transactions is overruled; (iii) the objection in the Objections regarding the PSR's cash-to-drugs conversion rate is overruled; (iv) the objection in the Objections regarding the 2-level safety-valve reduction is overruled; (v) the applicable offense level is 29; (vi) the applicable criminal history category is I; and (vii) the Guidelines imprisonment range is 87 to 108 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Ryan Ellison
  United States Attorney
Raquel Ruiz-Velez
Mia Rubin
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Paul Linnenburger
Lane + Linnenburger + Lane LLP
Albuquerque, New Mexico

*Attorneys for Defendant Miguel Antonio Ramirez*

---

[10]The recordings of Ramirez' post-arrest interview affirm the Court's conclusion. Ramirez' post-arrest interview lasts approximately thirty minutes, and, during the interview, Ramirez does not speak with a prosecutor.  See Post-Arrest Interview Part 1 at 0:00-15:09; Post-Arrest Interview Part 2 at 0:00-15:14.

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

*Attorney for Defendant Isaiah Anthony Aragon*